THE A. P. COOK COMPANY (LIMITED) v. HENRY H. APLIN, AUDITOR GENERAL.

*Taxes—Part-paid swamp lands—Lien of State—Drain tax.*

Act No. 44, Laws of 1883, providing for the re-assessment upon *patented* lands of unpaid taxes assessed while the lands were *part-paid*, applies to drain taxes assessed upon part-paid *swamp* lands under Act No. 216, Laws of 1861.

So *held*, where drain taxes were assessed upon part-paid swamp lands for 1866, 1867, and 1868, and were rejected by the Auditor General, and, after the land was patented to the original purchaser,—in which patent the State reserved any lien it might have for unpaid taxes assessed since the date of the contract of purchase,—such taxes were re-assessed under Act

No. 44, Laws of 1883, and the lands were returned delinquent therefor, and sold to the State, and the grantee of the patentee applied to the Auditor General to purchase the lands on payment of the general taxes for which it had also been sold, which application was refused, and the grantee then applied for *mandamus* to compel the Auditor General to cancel such drain taxes, and permit the redemption of the lands upon payment of the general taxes, interest, and expenses, because,—

*a*—The attempt to subject the lands to taxation for drainage purposes was in violation of the obligation of the contract of purchase.

*b*—It was not the intention of the law to tax part-paid swamp lands for drainage purposes during the years 1866, 1867, and 1868.

*c*—The general drain laws in force during said years had no application to part-paid swamp lands.

*d*—The State held no lien for said taxes when the patent was issued, June 10, 1881, at which date, as also at the time of the attempted re-assessment in 1883, said taxes belonged to the township of Dover, if to any one, and the State had no interest in the same, they having been rejected by the Auditor General.

*e*—Whatever liens the State held prior to such re-assessment in 1883 were all sold and disposed of under the statutes of 1881 and 1882, providing for the sale of State tax lands.

*f*—The State, having patented the land to the purchaser in 1881, could not thereafter appropriate it by reason of the non-payment of a claim existing in favor of another prior to and at the time of the issuing of said patent.

*g*—Act No. 44, Laws of 1883, was and is unconstitutional, in that it had and has no application to the taxes in question in this proceeding.

—Which application for *mandamus* was denied.

*Mandamus.* Submitted November 15, 1889. Denied December 28, 1889.

Relator applied for *mandamus* directing the respondent, as Auditor General, to cancel certain drain taxes, claimed to be an illegal charge upon its land. The facts are stated in the opinion.

*Stuart, Knappen & Van Arman,* for relator, contended:

1. A grant of land by the State constitutes a contract on its part, which it can no more repudiate than can an individual; citing

Cooley, Const. Lim. 274 *et seq.*; *Robertson v. Commissioner*, 44 Mich. 274; *Fletcher v. Peck*, 6 Cranch, 87, 136; *Terrett v. Taylor*, 9 Id. 43.

2. When the State descends from the plane of its sovereignty, and contracts with private persons, it is regarded, *pro hac vice*, as a private person itself, and is bound accordingly; citing Cooley, Const. Lim. 276 (note); *Davis v. Gray*, 16 Wall. 203.

3. After the patentee has fulfilled the conditions of the grant, and earned the same, a further legislative enactment that it shall not be transferred until debts of a certain class are paid, even though such debts are taxes imposed by the State, is void; citing Cooley, Const. Lim. 276 (note); *DeGraff v. Railroad Co.*, 23 Minn. 144; *Robertson v. Commissioner*, 44 Mich. 274.

4. The patent, when issued by the State, related back to the time of the original purchase, and gave the patentee all the title he could have had at the time of the issuing of the certificate; citing *Stout v. Keyes*, 2 Doug. 184; *Johnson v. Ballou*, 28 Mich. 379; *Railway Co. v. Gordon*, 41 Id. 420; *Fisher v. Hallock*, 50 Id. 463; and it cut off all intermediate claims, except such as were provided for by the contract, or by legislation in force when the contract was made. It did not cut off the State's lien, but destroyed the right of another party to divest the title by means of matter occurring between the making of the certificate and issuance of the patent. The township never had the right to tax the land before the patent was issued, except as personalty, and with such issuance this right was gone.

5. A grantor is estopped from setting up or giving validity to a title opposed to the grant, and, as shown, the State, as contractor, is as fully bound by this rule as is an individual; citing *Com. v. Andre*, 3 Pick. 224.

6. A construction of the act of 1883 which will make it apply to the taxes in question, the last of which were assessed 15 years before its passage, and at a time when the taxes themselves might reasonably be construed as barred by the statute of limitations, and certainly when they were stale and apparently abandoned, and two years after the patent had been issued for the land, would do violence to the act itself, and impair the obligation of the contract of purchase, and should be rejected; citing *Clark v. Hall*, 19 Mich. 356; *Aud. Gen. v. Supervisors*, 36 Id. 70; *Finn v. Haynes*, 37 Id. 63; *Fuller v. Grand Rapids*, 40 Id. 395; *Thomas v. Collins*, 58 Id. 64; *Aud. Gen. v. Circuit Judge*, Id. 345; *Hall v. Perry*, 72 Id. 202.

7. The remaining points of counsel are fully discussed in the opinion.

*S. V. R. Trowbridge,* Attorney General (*Moses Taggart,* of counsel), for respondent, contended for the doctrine stated in the opinion.

LONG, J. Act No. 44, Laws of 1883, of this State, entitled "An act to provide for the assessment of delinquent taxes assessed on part-paid lands in certain cases," provides:

"SECTION 1. That it shall be the duty of the Commissioner of the State Land-office, on the first day of October in each year, to prepare lists showing the descriptions of lands upon which taxes have been assessed for the current year, while the lands were part paid, but which had been patented by the State, and upon which taxes have not been paid, and forward the same to the supervisor of the township where the lands lie."

Section 2 makes it the duty of the supervisor receiving such lists to re-assess the taxes therein reported upon the same land.

Section 3 compels the township treasurer to collect and return the same in the same manner as provided for the collection and return of other taxes.

The lands described in relator's petition are a part of the swamp lands received by the State under the grant from the general government of September 28, 1850, and were sold by the State to Addison P. Cook on December 15, 1853, under Act No. 187, Laws of 1851, for 75 cents per acre, he paying one-third in cash. The purchase price having been paid in full, patent was issued to Mr. Cook on June 10, 1881, reserving claims for tax liens in the patent, as follows:

"Reserving, however, all liens which the State may have upon said lands for taxes assessed thereon since the 15th day of December, 1853, and remaining unpaid."

Mr. Cook conveyed said lands to relator on December 26, 1888. In 1883, under the provisions of Act No. 44,

the said lands were returned as delinquent tax lands for general taxes from 1863 to 1868, inclusive, and for drain taxes for the years 1866, 1867, and 1868, the drain taxes amounting to $196.57. For such taxes the land was for lack of bidders struck off to the State in 1885. This bid was for the amount of the general and drain taxes, interest, and expenses of sale.

September 7, 1888, application was made to the Auditor General by the relator for the purchase of said premises, on payment of taxes, exclusive of drain taxes. This being refused, *mandamus* is asked to compel the Auditor General to cancel such drain taxes, and permit redemption of said lands upon payment of the general taxes, interest, and expenses. Relator claims:

1. That the obligation of the contract so made by the State of Michigan with said Addison P. Cook for the sale and conveyance of said land on December 15, 1853, is violated by the said attempt on the part of the State to subject said land to said taxation for drain purposes.

2. That during the time covered by the years for which said drain taxes were so assessed it was not the intention of the laws of Michigan to tax part-paid State swamp lands under the general drain laws.

3. That the general drain laws in force during the years when said drain taxes were so attempted to be assessed had no application to part-paid State swamp lands; that as to said taxes assessed for general purposes, as well as for said drainage purposes, the same were and are invalid, for the following further reasons, viz.:

*a*—That the State of Michigan held no lien for any of said taxes when the patent for said lands was issued by the State to Addison P. Cook on June 10, 1881.

*b*—That all of said taxes, on said June 10, 1881, and at the time of the said attempted levy and spreading of the same in the year 1883, belonged to the township of Dover, if to any one, and the State had no interest in the same.

*c*—That whatever liens upon lands in this State were held by the State prior to the said attempted assessment in the year 1883 were all sold and disposed of under the statutes of Michigan of the years 1881 and 1882, providing for the sale of State tax lands.

*d*—That the State, having patented the land to said Addison P. Cook in the year 1881, could not thereafter lawfully appropriate said lands by reason of the non-payment of a claim existing in favor of another prior to and at the time of the issuing of said patent.

*e*—That Act No. 44, Laws of 1883, under the authority of which said assessment of taxes for said years 1863, 1864, 1865, 1866, 1867, and 1868 was attempted to be made, was and is unconstitutional and void, in that said act had and has no application to the taxes in question in this proceeding.

It is not contended but that the State can lawfully tax lands granted by the State for general purposes by virtue of its sovereign power, for the purpose of maintaining the government, and in pursuance of the general police power of the State. But the claim is made that drain taxes stand upon an entirely different footing from those for general State, county, township, highway, and school purposes; that the State, in accepting the grant from the general government under the act of September 28, 1850, assumed the obligation to drain and reclaim these swamp lands,—this obligation extending to the protection of the purchasers of the lands, and to relieve them from this burden. This grant to the State was to enable it "to reclaim the swamp and overflowed lands therein," and provided that—

"The proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of levees and drains." 9 U. S. Stat. at Large, 519.

This, however, is left to the discretion of the State how far such proceeds shall be applied, and a purchaser is not in a position to take advantage of the terms of the grant. In *Emigrant Co. v. County of Adams*, 100 U. S. 61, it was held that though the grant made by Congress by the act of September 28, 1850, of the swamp and overflowed lands to the states in which they lie, is

expressed to be for the exclusive purpose of enabling said states, with the proceeds thereof, to reclaim the lands by means of levees and drains, it is questionable whether the security for the due application of such proceeds does not rest upon the good faith of the state alone, and whether the state may not exercise its discretion in this behalf without being liable to be called to account, and without affecting the title to the lands; that at all events, it seems that Congress alone has power to enforce the condition of the grant; and since, by the act, the proceeds of the lands are to be applied to the designated purposes only as far as necessary, the state has at least a large discretion as to the necessity of employing the proceeds of the lands to the reclamation thereof.

Counsel for relator claim that it was the intention of the State, and its policy, to relieve the purchasers of these lands from such burden, and to use the proceeds of the sales for such purposes, as evidenced by the several early acts of the Legislatures after the acceptance of the grant from the government, and that this intention clearly appears from several subsequent acts; that Act No. 166, Laws of 1855, providing that persons purchasing government lands, whose purchases are set aside on account of the same being swamp lands, may purchase the same of the State at $1.25 per acre, subject to the condition that such purchaser shall not have any claim against the State for draining, is a recognition by the State of its original liability to purchasers to drain the same; and that Act No. 106, Laws of 1857, prescribing a condition of future sales; that the purchaser takes the same subject to the obligation imposed on the State by Congress, and to have no claim against the State to ditch, drain, or to reclaim the same, but shall fulfill all the obligations imposed on the State by act of Congress, etc.,

is also a recognition of such original liability upon the part of the State to purchasers, and evidence that the State was then for the first time seeking to repudiate its obligation under the act, and cast the burden upon others.

The history of the legislation of this State, however, admits of no such construction, and does not bear evidence of any intention on the part of the Legislature to cast upon the State the burden of such drainage, except as the Legislature has provided from time to time, out of the proceeds of the sales of such swamp lands.

Act No. 187, Laws of 1851, accepts such grant from the general government upon the basis of the field-notes on file in the Surveyor General's office, in accordance with a proposition of the United States land department. It provided for a sale of the same at a minimum price of 75 cents per acre, and for the creation of a fund for the reclaiming of the lands, but this was only a declaration of State policy, and did not debar the State from insisting that purchasers under their patents should submit to such taxation as the State might from time to time impose, not only for general purposes, but in the drainage of lands for the health of the inhabitants.

Act No. 106, Laws of 1857, § 2, fixed the minimum price at $5 per acre. Twenty-five per cent. of the proceeds of the sale under this act was by section 9 set apart as a drainage fund, to be applied by counties under the direction of the board of supervisors, and the balance to the primary school fund. This act repealed the provision made in the law of 1851 for a reclamation fund.

Act No. 31, Laws of 1858, fixed the minimum price at $1.25 per acre, and section 5 applied 50 per cent. of the proceeds of the sales to a swamp-land fund, and provided that 5 per cent. interest on such fund should be paid over annually to the board of supervisors, and the prin-

cipal applied to State indebtedness, the balance being applied to the primary school fund. This act, as well as the act of 1857, provided that the purchasers of these lands should have no claims against the State for drainage or reclamation of these lands, and that—

"All such sales shall be made subject to drainage and reclamation by the purchaser in accordance with the act of Congress granting such lands."

Section 15 of the act provided that—

"The part-paid swamp lands heretofore sold, and which shall hereafter be sold, shall be assessed in the same manner, and the taxes thereon shall be collected in the same manner, in all respects, as part-paid primary school lands."

Section 17 provided that—

"All the provisions of law now in force not inconsistent with this act, and applicable to the public lands of this State, shall be held to apply to the said swamp lands."

These acts cannot be construed as creating a contract on the part of the State to assume the burden of such drainage, or to relieve the purchasers therefrom. *Gilman v. Sheboygan,* 2 Black, 510. As was said in *Insurance Co. v. Debolt,* 16 How. 435, the language of such statute, to have the effect of exempting property from taxation, must be "too plain to be mistaken." That such statutes cannot be construed as creating a contract on the part of the State to reclaim these lands, see *East Saginaw Mfg. Co. v. East Saginaw,* 19 Mich. 259; *Crane v. Reeder,* 21 Id. 77; *U. S. v. White,* 2 Hill, 59; *U. S. v. Herron,* 20 Wall. 251; *U. S. v. Railway Co.,* 118 U. S. 120 (6 Sup. Ct. Rep. 1006); *U. S. v. Thompson,* 98 Id. 486; *Lindsey v. Lessee of Miller,* 6 Pet. 666; *Bank v. U. S.,* 19 Wall. 227; *State v. Board,* 36 Ohio St. 409.

A further claim is made that the State had no lien

for such drain taxes at the time of the patent to Cook, June 10, 1881; that all said taxes on that date belonged to the township of Dover, where such lands were situated, such taxes having been rejected by the State.

These drain taxes were originally assessed under Act No. 216, Laws of 1861. No question is raised as to any irregularity in the assessment and levy of the tax, or as to their having become a lien upon the land, except as above, and the further claim that the act of 1883, under which the re-assessment is made, is unconstitutional and void, in that the act had no reference to the drain taxes in question. The act of 1883 provides that the commissioner of the land-office, in October in each year, shall prepare a list of lands upon which taxes have been assessed for the current year while the lands were part paid, but which have been patented by the State, and upon which taxes have not been paid, and forward the same to the supervisor; and the supervisor is directed to re-assess such taxes upon the same land, etc. These drain taxes were assessed for the years 1866, 1867, and 1868, and have not been paid, and at the time of the execution of the patent to Mr. Cook it was specifically provided that he took the land subject to the liens which the State might have upon said lands for taxes assessed thereon since December 15, 1853, and remaining unpaid. This was the date of the purchase by Cook from the State, and the lands stood as part-paid swamp lands up to the date of the patent, June 10, 1881. The statute, by its terms, had reference to this class of lands. The current years while the lands were part paid were 1866, 1867, and 1868, and the act of 1883 provided for the re-assessment of the same tax.

The point made by counsel that this was a tax belonging to the township of Dover, and therefore the State had no lien, has no force. The power of taxation is

derived by such municipalities directly from the State. It is as much an exercise of sovereign power as though the State enforced it directly. Municipal organizations are but the auxiliaries of state government, and the taxing power delegated to such or any local organization, and the exercise of it by such body, is the same as though exercised by the state authority. *Knowlton v. Supervisors,* 9 Wis. 410; *Gilman v. Sheboygan,* 2 Black, 510; *Weeks v. Milwaukee,* 10 Wis. 242.

It is also contended by counsel for relator that the right to re-assess this tax is barred by the statute of limitations, and counsel cite, in support of this proposition, *Chamberlain v. Ahrens,* 55 Mich. 111 (20 N. W. Rep. 814). We think the case has no application to the present case. Here Mr. Cook took the patent containing a reservation of all liens which the State had for unpaid taxes. We think the Auditor General very properly insisted that these drain taxes, as well as the general taxes, constitu-ted a lien upon the premises.

The writ must be denied, with costs.

The other Justices concurred.